UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-80241-CIV-ZLOCH/ROSENBAUM

GREAT LAKES TRANSPORTATION
HOLDING LLC d/b/a METRO CARS,

    Plaintiff,

v.

YELLOW CAB SERVICE CORPORATION
OF FLORIDA, INC., et al.,

    Defendants.
_____/

## ORDER ON DISCOVERY MOTIONS

This matter is before the Court on Plaintiff/Cross-Claim Plaintiff's Motion to Compel Production of Documents and Compliance with Court Order ("Plaintiff's Motion to Compel") [D.E. 96], and Defendants/Counter-Plaintiffs/Cross-Defendants, and Non-Parties' Motion for Protective Order ("Defendants' Motion for Protective Order") [D.E. 82], referred to me by the Honorable William J. Zloch [D.E. 113]. The Court has reviewed the Motions, the filings supporting and opposing the Motions, and the case file. The Court has also heard oral argument from counsel at a hearing on February 1, 2010. During that hearing, the Court announced certain rulings with respect to Plaintiff's Motion to Compel but deferred ruling on Defendants' Motion for Protective Order. This Order memorializes the rulings on Plaintiff's Motion to Compel and sets forth the Court's decision regarding Defendants' Motion for Protective Order.

### Background

This case involves competing claims of trademark infringement and unfair competition between two groups of parties that provide chauffeured-car and other transportation services. Metro

Cars, Inc., ("Metro") was a Michigan corporation formerly owned by Gregory Eaton and Cullan Meathe. Yellow Cab Service Corporation of Florida, Inc., ("Yellow Cab") is a Florida corporation owned by Meathe. Daniel Ret formerly served as the chief operating officer of both Metro and Yellow Cab.

Sometime in 2006, Metro and Yellow Cab executed a license agreement for the trademark *METRO CARS $_{FL}$* ("the Florida mark"). The agreement acknowledged that Metro owned the Florida mark and had applied for federal registration of that mark.[1] (Metro had also previously registered the trademark METRO CARS ("the Metro mark").) Further, the agreement granted Yellow Cab a perpetual license to use the Florida mark in connection with its chauffeured-car business in Florida. Under the agreement, Yellow Cab promised never to challenge Metro's rights in the Florida mark and that, upon termination of the agreement, Yellow Cab would immediately cease all use of the mark.

In August 2006, Metro, Yellow Cab, and several related companies (collectively, "the debtors") borrowed $38 million from Bank of Montreal and two other banks (together, "the creditors"). In connection with that loan, the debtors granted the creditors a security interest in the debtors' personal property, including all trademarks and other intellectual-property rights. In June 2009, after the debtors defaulted on the loan, the creditors exercised their post-default remedies and proceeded to sell part of the loan collateral—the assets of Metro and related Michigan companies ("the Michigan assets")—at a public foreclosure sale. On July 13, 2009, Great Lakes Transportation Holding LLC ("Great Lakes" or "Plaintiff"), a newly formed company owned by Eaton, Ret, and a third individual, purchased the Michigan assets. The creditors subsequently transferred the rights to those assets, including the Metro mark and the Florida mark, to Great Lakes.

---

[1]The United States Patent and Trademark Office later granted the registration application.

Great Lakes later brought this action against Yellow Cab, Meathe, and several other Florida transportation companies owned by Meathe (collectively, "Defendants"). In its Complaint, Great Lakes alleges that it is the exclusive owner of the Metro mark and the Florida mark and that Defendants are using those marks illegally in connection with their competing transportation businesses. Great Lakes asserts federal claims for false designation of origin, *see* 15 U.S.C.A. § 1125(a) (West 2009), trademark dilution, *see* 15 U.S.C.A. § 1125(c) (West 2009), and trademark infringement, *see* 15 U.S.C.A. § 1114 (West 2009); common-law claims for unfair competition and unjust enrichment; and a claim alleging violation of the Florida Deceptive and Unfair Trade Practices Act, *see* Fla. Stat. Ann. §§ 501.201–501.213 (West, Westlaw through 2010 2d Reg. Legis. Sess.). Great Lakes's Complaint seeks damages, injunctive relief, and other remedies.

In response to Great Lakes's claims, Defendants allege that they used the Florida mark in commerce before Great Lakes and its predecessor (Metro) did and therefore that Defendants are the true owners of the Florida mark. On that basis, Defendants assert several counterclaims and third-party claims against Great Lakes, Eaton, and Ret, focusing on the parties' competing use of the Florida mark and "a black box with yellow swoosh." D.E. 20 at 13. These claims are generally similar to the claims brought by Great Lakes. In addition, Defendants plead state-law claims alleging that Eaton, Ret, and other Metro agents acted illegally to deprive Meathe and the other Defendants of their interest in the Florida mark, in part by forming Great Lakes to purchase the Michigan assets at the foreclosure sale.

Shortly before Great Lakes filed this action, the creditors brought a second foreclosure action against Yellow Cab, several related Florida companies, and Meathe in the United States District Court for the Northern District of Illinois. In that action, the creditors sought to further satisfy the defaulted loan debt by foreclosing their security interest in the assets of Yellow Cab and the related

Florida companies ("the Florida assets").[2]  After notice was given to other potential creditors, including Great Lakes, the court approved a private sale of the Florida assets to PTG Enterprises, LLC ("PTG"), a company located in West Palm Beach.  PTG financed its purchase of these assets with a secured loan from investment company Boathouse Capital ("Boathouse").  Although the Illinois court denied Great Lakes's motion to intervene in the foreclosure action, Great Lakes helped negotiate a provision of the sale-approval order expressly preserving its right to pursue the present trademark action against PTG.

### Discovery Motions

The parties previously filed three discovery motions, which the Court ruled on after a December 1, 2010, hearing.  Among these was a motion by Great Lakes seeking to compel Defendants to respond to five interrogatories and twenty-six requests for production.  *See* D.E. 63.  In an Order of December 8, 2010, the Court granted the Motion to Compel in part and denied it in part.  *See* D.E. 85.  The Court ordered that "[b]y **Wednesday, December 22, 2010,** Defendants shall produce responsive information and documents, as well as any privilege log in response to Requests for Production Nos. 10 through 17, 19, 20, and 38."  *Id.* at 13.

Great Lakes has now filed a second Motion to Compel concerning the production requests addressed in the Court's December 8 Order.  According to Great Lakes, Defendants have failed to "provide non-redacted copies of documents" and to "produce copies of all documents ordered to be produced."[3]  D.E. 96 at 2.  Great Lakes asserts that it needs these discovery responses for use in its

---

[2] The creditors also sought to collect from Meathe on a personal guaranty he had executed in connection with the loan.

[3] Great Lakes also originally argued that Defendants had failed to provide verified interrogatory answers.  *See* D.E. 96 at 2-3.  Because Defendants have since provided verified answers, however, this argument is now moot.  *See* D.E. 107 at 2; D.E. 118 at 2.

reply brief in support of its pending motion for summary judgment. That reply is due on February 14, 2011. *See* D.E. 115.

In addition, Defendants and Boathouse have filed a Motion for Protective Order, challenging subpoenas that Great Lakes has served on Boathouse.[4] *See* D.E. 82. Those subpoenas request documents concerning the sale of the Florida assets, Boathouse's secured loan to PTG for the purchase of those assets, and the ownership and structure of PTG. In general, Defendants and Boathouse object to the subpoenas on the ground that the requested information is irrelevant.

## Discussion

**A.     Plaintiff's Motion to Compel**

In its Motion to Compel, Great Lakes argues that Defendants' responses to its requests for production are incomplete. It contends that in response to eleven of the production requests addressed in the Court's December 8 Order—Numbers 10 through 17, 19, 20, and 38—Defendants have produced only six documents totaling approximately 264 pages and have not specified which of these documents are responsive to each request.[5] Further, Great Lakes notes that one of the documents produced by Defendants, the loan agreement between PTG and Boathouse, includes only selected portions of the original document and contains redactions of various numbers setting forth the specific terms of the agreement. *See* D.E. 96-4 at 1-6.

Defendants respond that they have produced all documents responsive to Great Lakes's requests. Regarding the loan agreement, Defendants maintain that the omitted portions do not

---

[4] The subpoenas were actually served on three "Boathouse Capital" entities: Boathouse Capital LP, Boathouse Capital GP LLC, and Boathouse Capital Management, LLC.

[5] In its Motion and at the February 1 hearing, Great Lakes also suggested that Defendants have failed to provide complete responses to other production requests addressed in the December 8 Order. It appears, however, that Defendants have produced documents responsive to at least some of those requests and that the parties' dispute centers on the eleven requests listed above.

5

contain responsive information and that the redacted figures are irrelevant and confidential.

Unless otherwise agreed or ordered, a party responding to a document-production request must either produce documents "as they are kept in the usual course of business" or "organize and label them to correspond to the categories in the request." Fed. R. Civ. P. 34(b)(2)(E)(i). At the February 1 hearing, Defendants' counsel acknowledged that the requested documents had not been produced in accordance with these requirements. Therefore, Defendants' counsel agreed to provide supplemental responses identifying the responsive documents for each request and indicating whether any privileged documents exist with respect to any of the requests. The Court and counsel agreed that these supplemental responses would allow Great Lakes to determine what documents are being produced in response to each of its requests. In view of the February 14 deadline for Plaintiff's summary-judgment reply, the Court directs Defendants to provide these supplemental responses by **noon on Monday, February 7, 2011.**

Regarding the figures redacted from the loan agreement, the Court finds that the redacted information is relevant and discoverable. As Defendants recognize, these figures include key terms of the loan for PTG's purchase of the Florida assets, such as "the amount the purchasers borrowed, the purchasers' interest rate, the purchasers' equity contribution and the number of warrants the lender received." D.E. 107 at 4-5. Great Lakes contends, *inter alia*, that these terms reflect the value that the parties to the loan transaction placed on the Florida assets, which may have included Defendants' claimed rights in the disputed trademarks. Great Lakes further asserts, based on documents produced by Defendants, that Meathe apparently has an ownership interest in PTG. In view of these arguments, the Court agrees with Great Lakes that the redacted information is relevant to Meathe's beliefs about whether he and the Florida companies owned the disputed marks and, if so, the value of those ownership rights. *See* Fed. R. Civ. P. 26(b)(1) (providing that "[p]arties may

6

obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense"). Based on Defendants' position that the redacted information is confidential, however, only Great Lakes's attorneys shall be allowed to view the unredacted loan agreement. As with the supplemental responses discussed above, Defendants shall produce the unredacted loan agreement by **noon on Monday, February 7, 2011.**

With respect to the omitted sections of the loan agreement, Great Lakes acknowledges that its discovery requests, as presently drafted, may not encompass the materials contained in the other parts of the loan agreement. Great Lakes further contends, and the Court recognizes, that because the sale of the Florida assets had not yet occurred when Great Lakes submitted its production requests to Defendants, Great Lakes did not have an opportunity to request information about the loan agreement. Although nothing prevents Great Lakes from filing another discovery request, in view of the impending deadline for Great Lakes to file its summary-judgment reply, the Court will allow Great Lakes to amend its requests to include all portions of the loan agreement. To the extent that Defendants do not object to Great Lakes's amended requests, Defendants shall produce any responsive portions of the loan agreement. If, however, Defendants object to any aspect of the amended requests, Defendants shall file **specific** objections and any materials supporting those objections. Again, Defendants shall produce responsive documents, or file any objections, by **noon on Monday, February 7, 2011.** If Defendants file objections to the amended requests, Great Lakes shall file a response to those objections by **noon on Tuesday, February 8, 2011.** The Court will then hold a hearing on Defendants' objections at **2:00 p.m. on Tuesday, February 8, 2011.**

B.   **Defendants' Motion for Protective Order**

In their Motion for Protective Order, Defendants and Boathouse ask the Court to prohibit Great Lakes from obtaining the documents requested in its subpoenas to Boathouse.[6] These subpoenas include seventeen requests for documents regarding various aspects of the sale of the Florida assets, Boathouse's financing of PTG's purchase of those assets, and information about PTG itself. *See, e.g.*, D.E. 82-1 at 8-11.[7]

The Court, upon a showing of "good cause," may "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). Among other things, a protective order may prohibit requested discovery or limit the scope of discovery to certain matters. *See* Fed. R. Civ. P. 26(c)(1)(A), (D). In evaluating whether a party has shown good cause, the Court must "balance the non-moving party's interest in obtaining discovery and preparing for trial against the moving party's proffer of harm that would result from the [discovery]." *Barrata v. Homeland Housewares, LLC*, 242 F.R.D. 641, 642 (S.D. Fla. 2007) (citing *Farnsworth v. Procter & Gamble Co.*, 758 F.2d 1545, 1547 (11th Cir. 1985)). Generally, the moving party "must make a specific demonstration of facts in support of the request" and of "the harm which will be suffered without" a protective order. *Dunford v. Rolly Marine Serv. Co.*, 233

---

[6] The Court recognizes that the challenged requests are contained in subpoenas to nonparties, namely, the Boathouse entities. *See* Fed. R. Civ. P. 45. Nonetheless, Defendants possess standing to seek a protective order precluding Great Lakes from engaging in third-party discovery that they claim is beyond the permissible scope of Rule 26. *See* Fed. R. Civ. P. 26(c); *see Auto-Owners Ins. Co. v. S.E. Floating Docks, Inc.*, 231 F.R.D. 426, 429-30 (M.D. Fla. 2005) (finding that defendants, as parties to the case, had standing to move for a protective order challenging nonparty subpoenas on relevancy grounds).

[7] Great Lakes actually served two, substantially identical sets of subpoenas on the Boathouse Capital entities. It appears that the only difference between the two sets is the production date. Although the parties dispute whether Great Lakes followed proper procedures in serving the original subpoenas (which it later withdrew), these arguments have no bearing on the Court's analysis of the present Motion.

F.R.D. 635, 636 (S.D. Fla. 2005).

Moreover, the Court may limit discovery when "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case . . . and the importance of the discovery in resolving the issues." Fed. R. Civ. 26(b)(2)(C)(iii). In so doing, the Court "can weigh discovery burdens against the likelihood of finding relevant material." *City of Waltham v. U.S. Postal Serv.*, 11 F.3d 235, 243 (1st Cir. 1993) (Breyer, C.J.). And when, as here, a person from whom discovery is sought challenges the relevance of the requested information, the Court must determine whether that information is relevant to the parties' claims and defenses or at least "reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1); *see Stern v. O'Quinn*, 253 F.R.D. 663, 670 (S.D. Fla. 2008) (explaining that a court need not address other requirements of Rule 26 if the party seeking discovery "cannot first demonstrate the relevance of the information sought," because "relevance serves as the gate through which all discovery requests must pass").

Here, Defendants and Boathouse chiefly argue that the requested details about the sale of the Florida assets and the parties involved in that transaction are irrelevant because the order approving the sale guaranteed that Great Lakes could maintain its present claims against the buyer, PTG. *See* D.E. 107-1 at 2-3. Those preserved claims, Defendants and Boathouse maintain, arose from earlier events and are unaffected by the sale. Defendants and Boathouse also claim that (1) the requests are overbroad because they seek information about the assets of companies that are not parties to this case, (2) the use and definition of the phrase "refer or relate to" in the requests is overly broad and burdensome, and (3) the requested information is confidential and privileged.

Four of the challenged requests—Numbers 5, 6, 15, and 16—seek documents regarding PTG itself. With respect to these requests, Great Lakes contends that it is entitled to learn the identity of

9

PTG's owners—as already mentioned, it believes Meathe is one of them—because it may wish to seek discovery from those individuals concerning the present claims and counterclaims. In this regard, the Court agrees that Request No. 6, which seeks various documents reflecting the ownership and structure of PTG, is within the broad scope of discovery permitted under Rule 26. *See* Fed. R. Civ. P. 26(b)(1) (allowing discovery concerning "the identity and location of persons who know of any discoverable matter"). On the other hand, Request No. 5, which asks for "[a]ll documents which refer or relate to the name, address, ownership, formation, or organizational structure of [PTG]" is impermissibly broad. This request would likely include many documents, such as letterhead, that list PTG's name or address but contain no substantive information about the company. The Court will therefore modify this request to seek "[a]ll documents which set forth the ownership, formation, or organizational structure of [PTG]." Similarly, the Court finds that Requests Nos. 15 and 16, seeking "[a]ll documents which refer or relate to" PTG and a related entity, are not "reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). These broad requests would encompass any document that even mentions PTG, including documents that reveal nothing about its ownership or structure. The Court therefore grants the Motion for Protective Order with respect to Requests Nos. 15 and 16, grants in part and denies in part the Motion as it regards Request No. 5, and denies the Motion with regard to Request No. 6.

According to Great Lakes, the remaining requests seek information that may show whether the disputed trademarks were included in the sale of the Florida assets and, if so, how the parties to the sale—especially Meathe—valued their alleged ownership interests in the marks. Great Lakes argues, and the Court agrees, that information showing how the parties to the sale viewed the ownership and value of the marks is relevant to the present claims and counterclaims contesting that ownership. But the subpoena requests, as drafted, sweep much more broadly. For example, they

10

seek from Boathouse

> 3. All documents which relate to any communications between or among you or your representatives on the one hand, and Cullan Meathe or representatives of Yellow Cab Service Corporation of Florida, Inc. [and related companies] on the other hand, relating to the potential or actual sale or purchase of the Collateral.
>
> 4. All documents, including but not limited to any communications, which relate to your participation (including, without limitation, lending funds) in any sale or purchase scheduled or which actually occurred in 2010, relating to all or any portion of the Collateral.
>
> 11. All documents which comprise your due diligence materials with respect to your consideration of, and decision to extend, any credit facility to the Purchaser(s).
>
> 12. All correspondence with any broker or agent involved in the sale or purchase of the Collateral.
>
> 13. All documents which refer or relate to any list of prospective purchasers to whom all or any portion of the Collateral was offered for sale or financing, and all correspondence between any persons or entities and such prospective purchasers.
>
> 17. All documents which refer or relate to any requests for bids on the Collateral.

D.E. 82-1 at 8-11.

Based on what appears from the record to be a substantial asset-purchase and loan transaction, it is clear that Great Lakes's broad requests would include many documents that do not mention the specific assets included in the sale or the value of those assets. For that reason, the Court finds that the requests are not "reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1); *see Stern*, 253 F.R.D. at 670. And while Defendants and Boathouse have not made a specific showing of the burden these requests would impose, it is plain from the face of the requests that the effort and expense of producing the requested documents would

11

outweigh the likely benefit of the discovery in revealing information about the sale assets or their value. *See* Fed. R. Civ. 26(b)(2)(C)(iii); *City of Waltham*, 11 F.3d at 243.

In view of these considerations, the Court finds it appropriate to limit Great Lakes's subpoena requests (other than the four requests discussed above) to documents that disclose or refer to (1) the assets included in, or excluded from, the sale of the Florida assets and the related loan transaction between PTG and Boathouse, or (2) the value of any such assets, either individually or collectively.[8] Further, Defendants and Boathouse correctly note that many of Great Lakes's requests use the term "relate to" in a manner that the Court has previously found to be overbroad, vague, and ambiguous. *See* D.E. 85 at 10-11. Thus, where the phrase "refer or relate to" appears in several of Great Lakes's requests, the Court will strike the words "or relate." Similarly, in Requests Nos. 3 and 4, the Court will construe the words "relate to" as "disclose or refer to."

Because the documents requested in Great Lakes's subpoenas were part of a private transaction, the Court credits Defendants' and Boathouse's argument that any responsive documents should be kept confidential. Therefore, as with the unredacted loan agreement discussed above in Part A, only Great Lakes's attorneys shall be allowed to view the documents responsive to its subpoenas. If Great Lakes believes that any of these documents should not be kept confidential, it may move for relief from the Court's confidentiality order. To the extent that Defendants and

---

[8]The Court recognizes Great Lakes's arguments for authorizing its subpoena requests as written. Great Lakes contends, for example, that responsive documents might reveal certain inconsistencies between Defendants' conduct in the asset-purchase transaction and their positions in this litigation. For the reasons discussed, however, the requests as drafted are far too broad to justify the mere possibility that they might uncover relevant evidence.

Also, the Court rejects Defendants' and Boathouse's argument that Great Lakes's requests are improper because they include information about assets of companies that are not parties to this case. Based on a review of the Northern District of Illinois's Order, the Court notes that these companies are apparently related to Yellow Cab and Meathe. In any event, the Court can protect the nonparties' privacy interests by keeping the responsive documents confidential.

Boathouse claim that any responsive documents are privileged, they may produce a privilege log in connection with those documents. Boathouse shall produce documents responsive to the subpoenas (as limited by the Court) and any privilege log by **5:00 p.m. on Thursday, February 10, 2011.**

### Conclusion

As set forth herein, Plaintiff/Cross-Claim Plaintiff's Motion to Compel Production of Documents and Compliance with Court Order [D.E. 96], and Defendants/Counter-Plaintiffs/Cross-Defendants, and Non-Parties' Motion for Protective Order [D.E. 82], are **GRANTED IN PART** and **DENIED IN PART**. Accordingly, it is hereby **ORDERED** that the parties shall comply with the production and filing deadlines detailed above. With respect to Plaintiff's Motion to Compel, it is further **ORDERED** that a hearing on any objections by Defendants to Plaintiff's amended document requests will be held on **Tuesday, February 8, 2011, at 2:00 p.m.,** at the United States Courthouse, 299 East Broward Boulevard, Courtroom 310, Fort Lauderdale, Florida.

**DONE** and **ORDERED** at Fort Lauderdale, Florida, this 4th day of February, 2011.

*(signature)*
ROBIN S. ROSENBAUM
United States Magistrate Judge

cc:   Honorable William J. Zloch
      counsel of record