UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-80241-CIV-ZLOCH/ROSENBAUM

GREAT LAKES TRANSPORTATION
HOLDING LLC d/b/a METRO CARS,

    Plaintiff,

v.

YELLOW CAB SERVICE CORPORATION
OF FLORIDA, INC., et al.,

    Defendants.
_____/

## ORDER DENYING DISCOVERY MOTIONS

This matter is before the Court on three discovery-related Motions referred to me by the Honorable William J. Zloch [D.E. 295]: Defendants' Motion to Compel, and for Contempt and Sanctions ("Defendants' Motion to Compel") [D.E. 223]; Plaintiff's Motion to Compel Discovery ("Plaintiff's Motion to Compel") [D.E. 258]; and Defendants' Motion for an Order of Contempt and for Sanctions ("Defendants' Motion for Contempt") [D.E. 265]. The Court has reviewed these Motions, the filings supporting and opposing the Motions, and the other materials in the case file. The Court has also heard oral argument from counsel at a hearing on November 21, 2011. For the reasons set forth below, the Court concludes that all three Motions should be denied.[1]

---

[1] Judge Zloch also referred to me Defendants' Motion to Compel Response to Request for Production Served August 3, 2011 [D.E. 262], and Plaintiff and Third-Party Defendants' Motion for Sanctions [D.E. 217]. On November 8, 2011, the Court denied the first Motion as moot because the document that Defendants sought had been produced. *See* D.E. 300. Following the motion hearing on November 21, 2011, Plaintiff and Third-Party Defendants withdrew the second Motion without prejudice to refiling it later. *See* D.E. 308.

**Background**

This case involves competing claims of trademark infringement and unfair competition between two groups of parties that provide chauffeured-car and other transportation services. Metro Cars, Inc., ("Metro") was a Michigan company formerly owned by Gregory Eaton and Cullan Meathe. Yellow Cab Service Corporation of Florida, Inc., ("Yellow Cab") was a Florida company owned by Meathe. Daniel Ret formerly served as the chief operating officer of both Metro and Yellow Cab.

Sometime in 2006, Metro and Yellow Cab executed a license agreement for the trademark *METRO CARS $_{FL}$* ("the Florida mark"). The license agreement acknowledged that Metro owned the Florida mark and had applied for federal registration of that mark.[2] (Metro had also previously registered the trademark METRO CARS ("the Metro mark").) Further, the agreement granted Yellow Cab a perpetual license to use the Florida mark in connection with its chauffeured-car business in Florida. Under the agreement, Yellow Cab promised that it would never challenge Metro's rights in the Florida mark and that, upon termination of the agreement, Yellow Cab would immediately cease all use of the mark.[3]

In August 2006, Metro, Yellow Cab, and several related companies (collectively, "the debtors") borrowed $38 million from Bank of Montreal and two other banks (together, "the creditors"). In connection with that loan, the debtors granted the creditors a security interest in the debtors' personal property, including all trademarks and other intellectual-property rights. In June 2009, after the debtors defaulted on the loan, the creditors exercised their post-default remedies and

---

[2]The United States Patent and Trademark Office later granted Metro's registration application for the Florida mark.

[3]The parties dispute whether, in fact, the license agreement was later terminated.

proceeded to sell part of the loan collateral—namely, the assets of Metro and related Michigan companies ("the Michigan assets")—at a public foreclosure sale. On July 13, 2009, Great Lakes Transportation Holding LLC ("Great Lakes"), a newly formed transportation company owned by Eaton, Ret, and a third individual, purchased the Michigan assets.[4] The creditors subsequently transferred the rights to those assets, including the Metro mark and the Florida mark, to Great Lakes.

In January 2010, the creditors brought a foreclosure action against Yellow Cab, several related Florida companies, and Meathe in the United States District Court for the Northern District of Illinois. In that action, the creditors sought to further satisfy the defaulted loan debt by foreclosing their security interest in the assets of Yellow Cab and the related Florida companies ("the Florida assets").[5] After notice was given to other potential creditors, including Great Lakes, the court approved a private sale of the Florida assets to PTG Enterprises, LLC, ("PTG") on September 15, 2010. Since that time, PTG, based in West Palm Beach, has provided transportation services using the Florida assets. PTG is wholly owned by Peninsula Transportation Group, LLC, which, in turn, is owned by the Jean Meathe Irrevocable Trust. Jean Meathe is Cullan Meathe's mother. Alan Shanaman serves as the sole trustee of the Jean Meathe Irrevocable Trust. Shanaman is also a member of PTG's board of directors, Cullan Meathe's personal lawyer, and an outside counsel for the corporate defendants in this lawsuit.

On February 12, 2010, Great Lakes filed this action against Yellow Cab, Meathe, and several other Florida transportation companies owned by Meathe. Great Lakes later added PTG as a

---

[4]Meathe unsuccessfully sought to qualify as a bidder in the sale of the Michigan assets.

[5]The creditors also sought to collect from Meathe on a personal guaranty he had executed in connection with the loan.

defendant.[6]  (This Order refers to all the named defendants collectively as "Defendants.")  In its Second Amended Complaint, Great Lakes alleges that it is the exclusive owner of the Metro mark and the Florida mark and that Defendants have used those marks illegally in connection with their competing transportation businesses.  Great Lakes asserts federal claims for false designation of origin, *see* 15 U.S.C. § 1125(a), trademark dilution, *see* 15 U.S.C. § 1125(c), and trademark infringement, *see* 15 U.S.C. § 1114; common-law claims for unfair competition, unjust enrichment, and breach of the 2006 license agreement; and a claim alleging violation of the Florida Deceptive and Unfair Trade Practices Act, *see* Fla. Stat. §§ 501.201–501.213.  Great Lakes's Complaint seeks damages, injunctive relief, and other remedies.

In response to Great Lakes's claims, Defendants allege that they used the Florida mark in commerce before Great Lakes and its predecessor (Metro) did and therefore that Defendants are the true owners of the Florida mark.  On that basis, Defendants assert several counterclaims and third-party claims against Great Lakes, Eaton, and Ret (together, "Plaintiffs"), focusing on the parties' competing uses of the Florida mark.  These claims are generally similar to the claims brought by Great Lakes.  Further, Defendants plead state-law claims alleging that Eaton, Ret, and other Metro agents acted illegally to deprive Meathe and the other Defendants of their interests in the Florida mark, in part by forming Great Lakes to purchase the Michigan assets at the 2009 foreclosure sale.

## Discussion

Discovery in this action has been contentious, with each side frequently accusing the other of improper conduct.  In the three Motions now before the Court, the parties seek relief for various discovery violations allegedly committed by their opponents and related non-parties.

---

[6]The Illinois federal court's order approving the sale of the Florida assets to PTG expressly preserved Great Lakes's right to pursue this action against PTG.

**Defendants' Motion to Compel**

In this Motion, Defendants seek to compel Plaintiffs to produce a draft financial report estimating the value of Ret's one-third interest in Great Lakes and another Michigan transportation company ("the Report"). Defendants also request a finding of contempt and award of sanctions against Plaintiffs for failing to disclose the Report after Judge Zloch ordered Plaintiffs to produce documents reflecting the value of Great Lakes.

In 2009, Ret hired an attorney to perform estate-planning services for him. In order to provide these services, the attorney directed Ret to obtain a valuation of his interest in Great Lakes. Ret retained the Rehmann Group ("Rehmann"), a Michigan accounting firm, to perform this valuation, and Rehmann subsequently prepared the Report.

Defendants learned of the Report and, on June 6, 2011, sought to obtain the Report and related documents from Rehmann through a subpoena issued in the Eastern District of Michigan. *See* D.E. 233-1 at 8-10. After Rehmann objected to producing these documents, Defendants moved the Michigan federal court to compel Rehmann's compliance with the subpoena. *See id.* at 1-5. On July 13, 2011, Ret filed a Response opposing Defendants' Motion to Compel, claiming that the documents sought in the subpoena were protected by the attorney-client privilege because they were prepared to assist Ret's estate-planning counsel in performing legal services. *See* D.E. 233-3 at 1-10. On July 15, 2011, the Michigan federal court denied Defendants' Motion to Compel with respect to the Report and related "work papers" but granted the Motion as it concerned any underlying, non-privileged documents used to prepare the Report. *See* D.E. 223-4 at 1-2.

During the same general period, the parties were litigating in this Court regarding Plaintiffs' production of certain documents. On April 21, 2011, Defendants served a request for Plaintiffs to produce "[d]ocuments indicating the value of [Great Lakes], including any loan applications, loan

5

agreements, security agreements, internal valuation memorand[a], [or] offers to either purchase or sell [Great Lakes] or any of its subsidiaries." D.E. 173-1 at 4 (Request No. 11; "the Valuation Request"). On May 23, 2011, Plaintiffs objected to the Valuation Request as overbroad and irrelevant but did not assert any privilege claim. *See* D.E. 173-2 at 2. Three days later, Defendants moved to compel Plaintiffs to respond to the Valuation Request and other production requests. *See* D.E. 173. On June 13, 2011, Plaintiffs filed a Response opposing Defendants' Motion but again raised no privilege objection concerning the Valuation Request. *See* D.E. 187 at 2-3. On July 8, 2011, Judge Zloch granted Defendants' Motion to Compel, ordering Plaintiffs to produce responsive documents by July 13, 2011. *See* D.E. 215 at 5. On July 13, Plaintiffs produced certain documents in response to the Valuation Request, *see* D.E. 223-1 at 2, but Plaintiffs did not produce the Report, nor did they raise any privilege claim. The next day, July 14, 2011, defense counsel asked Plaintiffs' counsel to produce a copy of the Report, noting that it "clearly falls within the parameters of" the Valuation Request. D.E. 236-2. Later that day, Plaintiffs responded by producing a privilege log concerning the Report. *See* D.E. 236-3.

In their present Motion to Compel, Defendants argue that Plaintiffs have waived any attorney-client privilege covering the Report by "not asserting it before this Court during the entire time this Court was addressing Defendants' Motion to Compel." D.E. 223 at 3. Defendants further contend that the Report is not privileged in any event because it is merely "a report by an accountant for . . . Ret." *Id.* In response, Plaintiffs note that the Michigan federal court previously upheld Ret's contention that the Report is privileged and therefore that Defendants could not obtain it from Rehmann. And Plaintiffs continue to maintain that the Report is privileged because Ret "commissioned the draft Rehmann report at the express direction of counsel and for the express purpose of obtaining legal services." D.E. 233 at 2. Moreover, Plaintiffs explain that their failure

6

to object to the Valuation Request on privilege grounds "was a mere oversight":

> At the time the request was served, Mr. Ret did not consider the draft Rehmann report to be responsive because it was not prepared as a valuation of Great Lakes, it was only a valuation of Mr. Ret's interest in the company. Great Lakes was not aware the valuation had been performed. Once the existence of the draft Rehmann report was disclosed to counsel for [Plaintiffs] they decided it may be responsive but was protected by privilege and should be listed on a privilege log.

*Id.*

A party who receives a document-production request normally must respond to that request within thirty days. *See* Fed. R. Civ. P. 34(b)(2)(A). For each item or category of items requested, the responding party must either produce the requested materials or state an objection with supporting reasons. *See* Fed. R. Civ. P. 34(b)(2)(B). This Court's Local Rules specify that an objection to a production request "shall state with specificity all grounds," further providing that "[a]ny ground not stated in an objection within the time provided by the Federal Rules of Civil Procedure, or any extensions thereof, shall be waived." S.D. Fla. L.R. 26.1(g)(3)(A).

In particular, when a responding party withholds responsive documents based on a privilege claim, the party must "expressly make the claim" and "describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(a)(5)(A). The Local Rules impose additional requirements for asserting a privilege claim—most notably, the preparation of a privilege log that includes various identifying information for each document being withheld. *See* S.D. Fla. L.R. 26.1(g)(3)(B), (C).

Together, these Rules indicate that a responding party may waive a privilege claim by failing to assert it in a timely fashion. *See also* Fed. R. Civ. P. 26(b)(5) advisory committee notes (1993) (explaining that if a party withholds otherwise discoverable materials on privilege grounds without

7

notifying the requesting party, such conduct "may be viewed as a waiver of the privilege or protection"); Fed. R. Civ. P. 26(b)(5) advisory committee notes (2006) ("Courts will continue to examine whether a claim of privilege or protection was made at a reasonable time when delay is part of the waiver determination under the governing law."). But the Rules do provide some flexibility on this issue. For example, when a party produces materials in discovery that it later claims to be privileged, the party may recover those materials upon notifying the receiving party. *See* Fed. R. Civ. P. 26(b)(5)(B); S.D. Fla. L.R. 26.1(g)(3)(D). Further, while courts have taken different approaches in addressing belated privilege claims, most courts finding a waiver of the claimed privilege have determined that the responding party "was more generally guilty of unjustified delay in responding to discovery." 8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 2016.1 (3d ed. 2010). "As the federal rules, case law and commentators suggest, waiver of privilege is a serious sanction most suitable for cases of unjustified delay, inexcusable conduct, and bad faith." *United States v. Philip Morris Inc.*, 347 F.3d 951, 954 (D.C. Cir. 2003) (internal quotation marks omitted) (reviewing finding of privilege waiver based on party's failure to list document in privilege log). Another court has recognized that "[m]inor procedural violations, good faith attempts at compliance, and other such mitigating circumstances militate against finding waiver," while "evidence of foot-dragging or a cavalier attitude towards following court orders and the discovery rules supports finding waiver." *Ritacca v. Abbott Labs.*, 203 F.R.D. 332, 335 (N.D. Ill. 2001).

Applying these principles here, Defendants correctly point out that Plaintiffs did not assert a privilege claim for the Report either in response to the Valuation Request or at any point during the litigation of Defendants' earlier Motion to Compel. As discussed above, Plaintiffs produced a privilege log regarding the Report one day after the July 13, 2011, production deadline set forth in

8

Judge Zloch's Order granting the Motion to Compel. Thus, whether measured from the original deadline for responding to the Valuation Request, or from the deadline imposed in Judge Zloch's Order, Plaintiffs' production of the privilege log was late.

Yet several factors weigh against a finding that Plaintiffs' delay in asserting a privilege claim resulted in a waiver of that claim. First, while the Report is responsive to Defendants' request for "[d]ocuments indicating the value of [Great Lakes]," that fact may not have been immediately obvious to Ret and the other Plaintiffs. The Report was prepared not in connection with Great Lakes's business but, rather, in the separate context of Ret's personal estate planning. Second, despite Defendants' claim to the contrary, the Court finds that the Report is, in fact, protected by the attorney-client privilege. At the specific direction of his estate-planning attorney, Ret procured the Report from an accounting firm (Rehmann) to assist the attorney in providing legal advice and services to Ret. *See, e.g.*, *In re OM Grp. Secs. Litig.*, 226 F.R.D. 579, 588 (N.D. Ohio 2005) ("The attorney-client privilege extends to memoranda and working papers prepared by an accountant at an attorney's request to assist the attorney in giving legal advice to the client.").[7] Third, although Ret's opposition to the Michigan subpoena shows that he was aware, by no later than mid-July 2011, that Defendants were seeking the Report, the record indicates that Ret was represented by different counsel in the Michigan proceedings. This circumstance helps explain the delay by Plaintiffs' Florida counsel in producing a privilege log for the Report. Fourth, no other evidence suggests that Plaintiffs purposefully delayed raising a privilege claim in response to the Valuation Request or

---

[7]*See also United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011) ("We have . . . extended the application of the [attorney-client] privilege to a communication between a client and an accountant, reasoning that '[a]ccounting concepts are a foreign language to some lawyers in almost all cases, and to almost all lawyers in some cases' and therefore that 'the presence of the accountant is necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit.'" (quoting *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961) (Friendly, J.))), *cert. denied*, 2011 WL 4460092 (U.S. Oct. 31, 2011) (No. 11-6569).

Judge Zloch's Order. *See Philip Morris Inc.*, 347 F.3d at 954; *Ritacca*, 203 F.R.D. at 335. Ret had previously asserted a successful privilege claim regarding the Report in the Michigan federal court, and Plaintiffs had no reason to believe that this Court would rule differently. Fifth, Plaintiffs' delayed assertion of privilege concerning the Report caused Defendants no surprise or prejudice. Through the Michigan proceedings, Defendants already knew that Ret—the Plaintiff to whom the Report most closely related—was asserting his privilege rights with respect to the Report.

For all these reasons, the Court concludes that Plaintiffs' delay in producing a privilege log for the Report did not result in a waiver of the attorney-client privilege protecting that document. *See Mitsui Sumitomo Ins. Co. v. Carbel, LLC*, No. 09-21208-CIV, 2011 WL 2682958, at *6 (S.D. Fla. July 11, 2011) (declining to find privilege waiver based on Plaintiff's failure to submit timely privilege log and explaining that "it would be an unduly harsh sanction to deem waived inarguably privileged documents in this instance absent a showing of bad faith or intentional dilatoriness," especially since "[i]t was no secret to Defendant that Plaintiff deemed the documents in question to be privileged"). Accordingly, Defendants' Motion to Compel is **DENIED**.

**Plaintiff's Motion to Compel**

In this Motion, Plaintiffs seek to compel the production of 485 e-mail messages listed on a privilege log submitted by non-party Farlie Turner & Co. ("Farlie") in response to a subpoena. *See* D.E. 258-1. As described further below, Farlie is an investment-banking firm that assisted Defendants and their corporate attorneys in connection with the loan default and subsequent foreclosure proceedings.

The e-mails listed in Farlie's privilege log date from March 3, 2009, to September 16, 2010. A variety of individuals are listed as senders or recipients of the e-mails. Defendants represent, and Plaintiffs do not dispute, that the e-mails were sent between various combinations of Defendants,

10

their outside corporate lawyers (Shanaman and Paul Battista), and Farlie personnel. For nearly all the e-mails, Farlie's privilege log asserts the attorney-client and work-product privileges[8] and describes the subject matter of the messages as follows:

> These communications involved strategy and the thought process of the attorneys for the Defendants, and Farlie Turner regarding the workout of the Bank Of Montreal Loan issues, including the possible refinance of the companies, possible purchasers of the companies, and bankruptcy, as well as defense strategies after the Bank of Montreal filed its lawsuit in January, 2010.

D.E. 258-1.

Regarding the overall format of Farlie's privilege log, the Court notes initially that most of the log entries provide the information required by Local Rule 26.1(g)(3)(B). There are some exceptions, however. A few of the entries do not specify the applicable privilege. *See, e.g.*, D.E. 258-1 at 19. And several of the entries, particularly near the end of the log, do not provide the date of the specified e-mail. *See, e.g.*, *id.* at 67. Because Plaintiffs appear to challenge these deficiencies, Farlie is hereby **ORDERED** to produce an amended privilege log that provides the missing information by **Tuesday, December 13, 2011.**

With respect to the substance of the privilege claims, Plaintiffs contend that many of the e-mails in Farlie's privilege log cannot be privileged because they were sent between non-lawyers—for example, from Defendant Meathe to Farlie director Steven Zuckerman.[9] *See, e.g.*, D.E. 258-1 at 1. Plaintiffs further assert that no privilege applies to these e-mails because Farlie was merely a "business advisor" that Defendants hired to help solve their debt problems through a sale of assets

---

[8]The Court recognizes that while the privilege log was submitted by Farlie, the claimed privileges belong to Defendants. Indeed, it appears that the privilege log was actually prepared by Defendants' counsel. *See* D.E. 258-2 at 1.

[9]Zuckerman is admitted to the Florida Bar; however, in connection with the investment-banking services that Farlie provided to Defendants, Zuckerman was not acting as a lawyer.

or other means. D.E. 258 at 5.

Defendants respond that the disputed e-mails are subject to the attorney-client privilege because Farlie was not just a financial advisor to Defendants but was hired, at Battista's recommendation, "to assist the Defendants' attorneys in their representation of the Defendants."[10] D.E. 271 at 4-5. In support of this claim, Battista has submitted an affidavit explaining that he advised Defendants to retain Farlie so that the firm—and, in particular, Zuckerman—could provide Battista and Shanaman with "necessary, or at least highly useful information, advice, and insights allowing [the attorneys] to effectively render legal advice to [Defendants] about strategies, tactics, and decisions relating to different work out scenarios with the [Bank of Montreal], possible purchase of the assets, Yellow Cab's possible bankruptcy, and/or the structure and financing related to any of the above." D.E. 271-6 at 3 (Affidavit of Paul J. Battista). Further, Battista's affidavit confirms that Defendants did retain Farlie for these purposes and that Farlie communicated extensively with Battista, Shanaman, and Defendants, including in the e-mails listed in the privilege log. *See id.* According to Battista, he, Shanaman, and Zuckerman "were part of a defense team brainstorming and discussing strategies and tactics which allowed us to render legal advice to [Defendants] about courses of action, including workout scenarios with BoM, the structure of any financing, a possible Yellow Cab bankruptcy, and the structure of a purchase of the Yellow Cab assets." *Id.* at 3-4.

"Generally, disclosing attorney-client communications to a third party undermines the privilege." *Cavallaro v. United States*, 284 F.3d 236, 246-47 (1st Cir. 2002). However, "[a]n

---

[10] Aside from Farlie's privilege claims, Defendants argue that some of the disputed e-mails are irrelevant. Because Defendants did not object to production of the e-mails on relevancy grounds, however, Defendants have waived that objection. *See Auto-Owners Ins. Co. v. S.E. Floating Docks, Inc.*, 231 F.R.D. 426, 429-30 (M.D. Fla. 2005) (finding that defendants, as parties to the case, had standing to move for a protective order challenging nonparty subpoenas on relevancy grounds). Moreover, defense counsel acknowledged at the motion hearing that the only issue presented by Plaintiffs' Motion is whether the e-mails listed in Farlie's privilege log are, in fact, privileged.

exception to this general rule exists for third parties employed to assist a lawyer in rendering legal advice." *Id.* at 247. Courts have recognized that "[b]ecause the practice of law has increasingly grown more complex, attorneys cannot function effectively without the help of others," including "financial professionals." *Ferko v. NASCAR, Inc.*, 218 F.R.D. 125, 134 (E.D. Tex. 2003) (citing *United States v. Kovel*, 296 F.2d 918, 921-22 (2d Cir. 1961) (Friendly, Circuit Judge)). Thus, attorneys may "divulge client information to accountants or financial professionals in order to represent their client more effectively." *Id.* at 138. Although courts have articulated various standards for determining whether communications with third-party financial advisers are privileged, the key requirement is that the communications are made for the purpose of obtaining legal advice from counsel, rather than financial advice from the third party. *See id.* at 135; *see also Dahl v. Bain Capital Partners*, 714 F. Supp. 2d 225, 228 (D. Mass. 2010) (observing that "the third party's communication must be made for the purpose of rendering legal advice, rather than business advice").[11]

Based on a careful review of the record here, the Court concludes that the e-mails listed in Farlie's privilege log are protected by the attorney-client privilege. Despite Plaintiffs' contention that Farlie was simply a business advisor to Defendants, Battista's affidavit shows that Farlie was retained largely to provide specialized advice to Defendants' corporate counsel about various options for resolving Defendants' financial problems. This advice, in turn, allowed counsel to represent Defendants more effectively in connection with the loan default and foreclosure proceedings. Defendants represent, and Battista's affidavit confirms, that the disputed e-mails include

---

[11]*See generally* Jay M. Zitter, Annotation, *Applicability of Attorney-Client Privilege to Communications Made in Presence of or Solely to or by Non-attorney Consultants, Professionals, and Similar Contractors*, 66 A.L.R. 6th 83, §§ 6-9 (2011) (discussing cases that address whether communications involving third-party accountants and other financial advisers are privileged).

13

communications among Defendants, their attorneys, and Farlie concerning these matters.[12] Because Defendants have adequately demonstrated that these e-mails are privileged, Plaintiffs' Motion to Compel is **DENIED**.

**Defendants' Motion for Contempt**

In this Motion, Defendants seek contempt and sanctions against Plaintiffs and their counsel for allegedly violating two Orders issued by Judge Zloch: (1) a protective order that limited Plaintiffs to taking ten depositions in this case, *see* D.E. 164; D.E. 171; and (2) a pre-trial scheduling order that required the parties to complete all discovery by October 1, 2011. *See* D.E. 243. Defendants claim that Plaintiffs violated these Orders by taking an eleventh deposition, that of Farlie's representative, on October 10, 2011.

Plaintiffs respond that Defendants' counsel *agreed* to allow Plaintiffs to depose Farlie's representative on October 10. Specifically, Plaintiffs have submitted a sworn affidavit from their counsel detailing his agreement with defense counsel, as well as a September 29, 2011, e-mail message from defense counsel stating that "I don't have a problem with you taking the 11th deposition" and suggesting that the parties stipulate to holding the Farlie deposition on October 10 "due to scheduling issues." D.E. 265-4 at 1; D.E. 270 at 3-4. Defendants acknowledge their counsel's agreement to proceed with the Farlie deposition on October 10, but they maintain that this agreement was conditioned on Plaintiffs filing a stipulation and obtaining a Court Order authorizing

---

[12]Plaintiffs also challenge Defendants' claim of work-product protection, arguing that some of the e-mails were sent several months before the creditors filed the foreclosure action in January 2010 and therefore those messages "cannot encompass 'defense strategies' for" that lawsuit. D.E. 258 at 3. The Court rejects this argument, however, because Farlie's privilege log refers only to "defense strategies *after* the Bank of Montreal filed its lawsuit in January, 2010." D.E. 258-1 (emphasis added). In addition, the Court has considered the other arguments raised in Plaintiffs' Motion and finds them to be without merit.

the deposition.[13] Purportedly because Plaintiffs failed to take these steps, Defendants objected to the Farlie deposition based on the prior Orders restricting the number of depositions and the timing of discovery.

Defendants are correct that, in view of Judge Zloch's Orders limiting discovery, Plaintiffs should have sought approval from the Court to take the Farlie deposition on October 10. Without such approval, Plaintiffs were not free to depart from the specific terms of the earlier Orders, even if they perceived good reasons for doing so. Judge Zloch's protective order specifically limited Plaintiffs to taking ten depositions. *See* D.E. 164; D.E. 171. And the pre-trial scheduling order required the parties to complete all discovery by October 1, 2011, emphasizing that "**THE PROVISIONS OF THIS ORDER SHALL SUPERSEDE ANY DEADLINES OR SCHEDULES AGREED UPON BY THE PARTIES.**" D.E. 243 at 1-2.[14] Therefore, in the absence of a further Order granting relief from these requirements, Plaintiffs' taking of the Farlie deposition on October 10 violated the Court's discovery Orders.[15]

---

[13]Defense counsel contends that the agreement was also conditioned on Plaintiffs not filing a motion to compel regarding the e-mails listed in Farlie's privilege log. But the record refutes this claim: Plaintiff's counsel denies in his affidavit that any such condition existed, and defense counsel's e-mail agreeing to the deposition nowhere mentions the written-discovery issue. *See* D.E. 265-4 at 1; D.E. 270 at 4.

[14]The Local Rules further confirm that the Court's discovery deadline was binding on the parties:

> Discovery must be completed in accordance with the court-ordered discovery cutoff date. Written discovery requests and subpoenas seeking the production of documents must be served in sufficient time that the response is due on or before the discovery cutoff date. Depositions, including any non-party depositions, must be scheduled to occur on or before the discovery cutoff date.

S.D. Fla. L.R. 26.1(f)(2).

[15]Plaintiffs contend that the Farlie deposition was justified by other Orders authorizing Plaintiffs to take discovery from Farlie. *See* D.E. 194; D.E. 222. Those Orders, however, addressed

The Court cautions Plaintiffs and their counsel about the obligation to comply with all Court Orders, including those governing the scope and timing of discovery. Parties may not simply ignore the Court's clear directives whenever it suits them. Such conduct may result in a finding of contempt and the imposition of other serious sanctions. *See, e.g.*, Fed. R. Civ. P. 37(b).

Here, however, the Court declines to grant Defendants' request for contempt and sanctions based on Plaintiffs' unauthorized scheduling of an eleventh deposition after the discovery deadline, because Defendants' counsel expressly consented to that course of action. *See* D.E. 265-4 at 1. Though Defendants now claim that they insisted on a Court Order allowing Plaintiffs to take the Farlie deposition on October 10, defense counsel's September 29 e-mail requested only "a simple stipulation which states that we agree to taking the deposition as set on October 10, 2011." *Id.* "The stipulation," defense counsel suggested, "will then cover the prior orders, including the discovery cut-off and none of us will be violating the Orders, whichever ones apply." *Id.* While defense counsel may have envisioned a formal stipulation rather than an agreement between counsel, his e-mail makes clear that he agreed in substance to Plaintiffs' scheduling of the Farlie deposition and that he, like Plaintiffs' counsel, erroneously believed that Court approval was not necessary. *See* Fed. R. Civ. P. 29(b) (providing that "a stipulation extending the time for any form of discovery must have court approval if it would interfere with the time set for completing discovery").

To summarize, although Plaintiffs' noticing of the Farlie deposition for October 10 contravened the prior discovery Orders, Defendants agreed to proceed with the deposition as scheduled and without Court approval. Therefore, while the Court does not condone Plaintiffs'

---

only written discovery. *See id.*; D.E. 190 at 2. Plaintiffs also note that a party may take more than ten depositions without leave of court if the parties so stipulate. *See* Fed. R. Civ. P. 30(a)(2)(A)(i). While this is normally true, such a stipulation would not have sufficed here because Judge Zloch's protective order affirmatively prohibited Plaintiffs from taking more than ten depositions.

16

unauthorized discovery, Defendants cannot be heard to complain of that discovery after having freely consented to it. Consequently, Defendants' Motion for Contempt is **DENIED**.

### Conclusion

Accordingly, as set forth above, it is hereby **ORDERED** as follows:

1. Defendants' Motion to Compel, and for Contempt and Sanctions [D.E. 223] is **DENIED**.

2. Plaintiff's Motion to Compel Discovery [D.E. 258] is **DENIED**. However, by **December 13, 2011,** Farlie shall produce an amended privilege log that includes the dates and privilege information for all the listed e-mails.

3. Defendants' Motion for an Order of Contempt and for Sanctions [D.E. 265] is **DENIED**.

**DONE** and **ORDERED** at Fort Lauderdale, Florida, this 29th day of November, 2011.

ROBIN S. ROSENBAUM
United States Magistrate Judge

cc: Hon. William J. Zloch
Counsel of record